Good morning and welcome to the Court of Appeals for the Third Circuit. Our first case today is Ndungu v. Attorney General, number 20-2562. Proceed. Proceed. Your Honor, may it please the Court, my name is Christopher Healy. On behalf of the petitioner, I'd like to reserve five minutes for rebuttal. That'll be granted. Thank you. This Court ordered a hearing on Bonk to decide whether the concept of a realistic probability... Can I ask the attorneys to keep their voices up, please? ...whether the concept of a realistic probability of prosecution should be a consideration each time this Court applies the categorical approach. Petitioner, the amici, and the government all agree that the answer is no. The goal of the categorical approach is to answer a legal question. The government agrees that that analysis requires courts to compare the elements of a prior conviction to those of the relevant federal offense. The government agrees that when a state statute criminalizes more conduct than the generic federal offense, it is not a categorical match... You know, I still can't hear you. ...and there is no need for a further realistic probability inquiry. And the government also agrees, at least implicitly, that the court should not adopt the actual case requirement required by the Fifth Circuit. Where we disagree with the government is on much narrower grounds. The government claims that this Court analyzes crimes involving moral turpitude differently than most other courts do. I think that that conflict is largely illusory, and in any event, it's not presented in this case... ...because the Pennsylvania fleeing statute is overbroad on its face. On the broader question of whether this Court should adhere to its longstanding precedent on the categorical approach, it should do so. This Court's decisions are compliant with the INA, they're consistent with the Supreme Court's precedent, and they're consistent with the decisions of the majority of other circuits. I acknowledge the concerns that some members of the Court have expressed about the categorical approach, but it is the law, and whether to revise it and how to revise it are questions for Congress. I welcome the Court's questions. Well, I'll start us off, but obviously you've read our precedent. What needs changing, in your view, if anything? I don't think that there's anything that needs to be changed in this Court's precedent. I think it is consistent, most importantly, with the INA and with Supreme Court categorical approach decisions, and with the vast majority of other courts of appeals. So there are two questions here. One, the first one you're all in agreement on, applying the categorical approach you all say we should do it the way the majority of the circuits do, the way we've been doing it, not the way the Fifth Circuit. But that second question, which the government takes hit on, your brief doesn't, which is should crimes involving moral turpitude be exempt from the realistic probability analysis that we apply in all the other categorical approach contexts? Properly applied, as the government says it should be. Your brief doesn't take a position on it. Why shouldn't we adopt the government's approach and say, no, CIMTs aren't exempt from that? Well, I actually don't think this Court's precedent holds that CIMTs are exempt from that. I acknowledge that it's a little bit unclear, but this goes back to John Lewis. Okay, so you don't have a problem with our reading precedent to say, yes, we can apply realistic probability to CIMTs? Yes, in the same way that the Court applies realistic probability in every other categorical approach case, which is only if there is, first, a categorical match. All right, well, then why don't you lose under that? First step, statutory language. Okay, the panel, you know, you have this, is it turpitudinous on its face? You've got a problem with fleeing or attempting to allude. But let's say you get past that and say that's turpitudinous. Second stage, does anyone actually get prosecuted for non-turpitudinous conduct under this, or is it all saved by, you know, defenses, no one gets prosecuted? So how is it that you can prevail under that test? Well, a couple of points. I want to take the second one first, because I don't agree that the way you have characterized the realistic probability approach is how this Court has actually applied it. Why don't you tell us how you think it does apply?  So I think in a situation where the Court undertakes the normal categorical analysis and uses all the normal tools of statutory interpretation to decide what the meaning of the state offense is, if you conclude that it's a categorical match, then that generally ends the analysis. But if the non-citizen or the defendant contends that there's some feature of state law that suggests that it would apply this statute in a manner the text doesn't suggest it to capture overbroad conduct, then they have to put forth some evidence to show that that actually happens. But that only comes into play when the elements are not – there's no overlap. At least there's a line or two in Moncrieff that suggests that the government posited this antiques firearms exception. And the Supreme Court says in response to the antiques firearm exception, oh, just to make sure that we don't have a categorical mismatch because there's an antiques firearm exception, it's fine to look at a realistic probability to find out whether anyone would actually be prosecuted or convicted for antiques firearms under state law. And if they aren't, and if there's not a realistic probability of that, then you can prune that off and then you have a categorical match. That's the Supreme Court. That's not our precedent. Why isn't – that might not apply in criminal cases. There's Sixth Amendment issues in criminal cases. There's a lot of other things in criminal cases. But at least in the immigration context, and Moncrieff was an immigration case, why isn't that pretty clear direction of what the plan of attack should be? So a few points in response to that. First, so the holding of Moncrieff did not apply that kind of realistic probability analysis. The antiques firearm discussion was dicta at the end of the decision. It wasn't really dicta. It was rejecting one of the government's contentions for why the government should win. So, I mean, if it doesn't reject that, it feels like the government should win. It wasn't the core holding, true, but it was rejecting one of the government's counterarguments for why the holding was wrong. Well, the court also didn't analyze any particular firearm statute in making – in that discussion. I mean, it didn't – and that's why the second part of Moncrieff is interesting where it was kind of the pastive joint exception with respect to the marijuana laws. And they said, hey, Georgia seems to prosecute this. So in that case, with two datasets in Moncrieff, one, antiques firearm where they're talking at a broad level, and two, when they say Georgia does prosecute the pastive joint exception, our use of realistic probability in that case, though, in yours to the benefit of the petitioner. So I think – and this is why I think this area is a little bit challenging because I think there are – sometimes people mean different things when they say different realistic probabilities. So I think the holding of Moncrieff, which is the Georgia marijuana statute, I think that that was a pretty straightforward and appropriate application of the categorical approach because what the court was doing was trying to understand the needs and bounds of the state offense. And of course – In the context of doing that, did they or did they not do just what Judge Fitts said and ask themselves and answer the question, is this something that would get prosecuted or not? They did that, didn't they? I don't think that they were asking whether the state prosecutes it. What they were trying to determine is whether the crime – whether the offense covers the transfer of small amounts of marijuana. What was the point of talking about it if it was not something that they figured in their analysis? These are pretty smart, careful people. They're not just trying to meet a word limit for a high school essay. They're talking about it because it's meaningful, right? Yeah, of course, Your Honor. So when you're talking about state law, I mean, obviously federal courts are not – or state courts, rather, are the final decision makers on the meaning of state law. And so it's always appropriate when you're applying the categorical approach and you have a state statute before you to ask how the state's courts have interpreted the text of that statute. But I think – can I just follow up on Judge George's question? Because there's a quote right here in Moncrief that says, quote, we know that Georgia prosecutes this offense when a defendant possesses only a small amount of marijuana. So that seems to be something beyond just how does a state court interpret a statute. That seems to go to at least some check-in with what prosecution decisions are made. I think we know that Georgia prosecutes the offense and it has a site to a state court. I – yes, I recognize the court said that, but I think that what they were doing was looking to court decisions to understand the meaning of the state statute. And if there were any doubt about that, I think Taylor and Malooly dispelled that. I mean, Malooly in particular, because, Your Honor, you noted that there may be Fifth and Sixth Amendment concerns in the criminal case. Malooly is an immigration case. And it's an immigration case interpreting a state – applying the categorical approach to a state law. And in that case – and the government argued at pages 39 to 40 of their Supreme Court brief that the petitioner there had never shown proof that Kansas has ever prosecuted a paraphernalia – has never prosecuted paraphernalia for a non-federally controlled substance. And the Supreme Court didn't – that did not sway the Supreme Court at all. The fact that the Kansas drug schedule included nine substances that were not included on the federal CSA meant that it was overbroad. And that was – the text of the statute made unambiguous that there was no match. Whereas here, we've got this issue. What is it about fleeing or attempting to elude willfully that makes it non-terpitudinous? And this is one where CIMT, you have these borderline cases, unlike matching up an aggravated felony, where then second stage realistic probability is actually helpful. Would they interpret it to apply to a situation in which someone had a good reason for trying to pull over across the state line or something? I think we – I mean, I think the face of the statute – So, to interpret what moral turpitude means in this context, because this – because moral turpitude is a very broad term that applies to various classes of offenses, fraud, sex offenses. In this class, which is a sort of endangerment class of offense, this course decisions look at whether the state offense requires as an element actual injury to another person or at least a grave risk of actual injury or death to another person. That's Mon, Baptiste, and NAPIC. So, I think that is the actus rei. CIMT doesn't have to be that. Lots of fraud offenses are included, too. So, that's one way to show turpitude, the actual risk of injury. But why isn't the act of willfully fleeing or eluding a police officer itself turpitudinous? Well, I mean, moral turpitude – I mean, the actus rei element in particular, it's an act that is inherently base, vile, depraved, contrary to the accepted rules of morality and all the rest of it. I mean, failing to stop in response to a police officer's signal is certainly unlawful, and it's certainly not to be condoned. But, I mean, I don't think that it inherently rises to that level of true depravity. That is what, like, the CIMT – it's flouting the law, and the law is built to require that you know the person, that the vehicle is marked. Go ahead. I'm sorry. Don't Sykes and Jones suggest otherwise? The Supreme Court, in repeating those characterizations, has suggested that the act of fleeing and triggering a police chase does appear to be inherently depraved because of the danger that it creates in that ensuing chase. So, Judge Krause, I respectfully disagree with that for a couple of reasons. First, Sykes, and then, of course, decisions in Jones, were applying a different flavor of the categorical analysis. Those were both residual clause cases where the question wasn't what the prior conviction required as an element. The question was, what is the ordinary case of this? What do we think the ordinary case of this is? How does that speak to chirpitudinous? Judge Krause's question, if I understand it is, Sykes and Jones talk about the danger that fleeing police or eluding the police will create. Whether it's residual clause or elements clause, what difference does that make? Why is it any less chirpitudinous? If the point is, you create a danger. Well, I suppose the point I'm trying to make, Your Honor, is that in the analysis under the elements clause, sorry, not the elements clause, but the CIMT elements-based analysis, the question is whether there is an element of danger, not whether we think this class of offenses in general and the way they're normally committed include danger. Okay, so answer the question about Jones and Sykes. You've just made a statement that this couldn't really be a CIMT because it's not chirpitudinous because it's not inherently vile, base, and depraved. You know, you could have a debate about that, I guess, philosophically, but Jones and Sykes are on the books. How do you get around those? Well, I mean, for one, just a different analysis, not asking the same question that the court has to ask here. Second, that analysis in particular in Jones, I mean, the ordinary case approach is so indeterminate that was a big part of what led the Supreme Court in Johnson to strike down residual clauses unconstitutionally vague. So I don't think that that character of thinking, that approach to the categorical approach, has much grounding anymore after the- It's really a different analysis because if you agree that we apply realistic probability to crimes involving moral chirpitude, we've moved away from an element to element comparison, right? I mean, at that point, we are doing something like the residual clause. We're looking at elements as compared to a description, a characterization of what those elements are. I mean, I guess there's a fundamental question about whether you can even look at realistic probability in a categorical approach when you're talking about crimes involving moral chirpitude. I think that was perhaps part of our reluctance in carrying it over to begin with, and I'd like your input on that. But if we're going to do that, then how is this really any different than the kind of analysis that we were doing in Jones and the Supreme Court did in Sykes? Go ahead and answer. Well, I think we're not maybe perhaps agreeing on what the realistic probability inquiry is. So it's not a question about how is the crime usually committed or what is inherent in the crime. Realistic probability asks, essentially, is it likely that the state statute criminalizes the conduct, the proposed minimum conduct? It doesn't ask whether it's likely that that minimum conduct is going to emerge as a fact pattern in the real world or whether a state is going to exercise its discretion to prosecute it if it did arise. That's the only way I think you can square it with the categorical approach's focus on the definition of the crime. I mean, in Taylor, the Supreme Court said the categorical approach isn't concerned with how an offense is sometimes or usually committed. It's concerned with what the government has to prove as an element. Now, to Judge Budas' question, I acknowledge in the moral turpitude context that term is a little vague, although the Supreme Court has held that it's not unconstitutionally so. But I think you have to look to the way that this court has construed moral turpitude in this area of offenses, which is Monn and Mavick and Baptiste, which those cases say moral turpitude in this area requires actual injury or a grave risk of actual injury to another person. All right. Thank you, counsel. We'll hear you on rebuttal. And we'll hear from Mr. Kimberly now. First of all, thank you for your brief and for coming to oral argument today. We're grateful. You argue that the reasonable probability test is really a purely interpretive one in your brief and not an empirical one about how the government prosecutes a crime. But as my colleagues pointed out in Moncrief and I think in the Duenes-Alvarez case as well, the Supreme Court seems to suggest that a petitioner would sometimes, this is a quote, have to demonstrate that the state actually prosecutes the relevant offense in an overbroad manner. Doesn't that sound like an empirical test? Your Honor, I think what you've just quoted is from Duenes-Alvarez. If the legal landscape that we were operating on included Moncrief and Duenes-Alvarez and nothing else, I think it would be a closer call. I think we have to look at those cases through the lens of Taylor, the 2022 case. And if I could, I'll briefly describe how Justice Gorsuch, writing for the court, described Duenes-Alvarez. It said of that case, Duenes-Alvarez argued that state courts had interpreted the offense broadly to reach aiding and abetting conduct that fell beyond generic theft. Your Honor, this is, I'm reading page 2024 of the slip opinion. To test this assertion. I don't think you said which case that was. This is Taylor 2022? Yeah, that's what I thought. So now this is the court characterizing the holding in Duenes-Alvarez. To test this assertion, the court looked to state decisional law and asked whether a realistic probability existed that the state would apply its statute to conduct that falls outside the federal generic definition. Now that is a description, Your Honor, of what the court was doing in Duenes-Alvarez exactly as the kind of interpretive inquiry that we laid out in our brief. And it makes sense because... Wait, just a second. What's the purpose of couching that in terms of realistic probability? If I understand what you're saying, you're saying they really weren't talking about realistic probability. They were really asking what's the state court's interpretation of the state statute. If that's what's going on there, why did they talk in Duenes-Alvarez about realistic probability? And even in Taylor 2022, why did they speak about it in terms of realistic probability? What's the purpose of using those words if they do not mean there's a question about prosecutorial decision-making? So, Your Honor, I think it's a recognition, one, that prosecutorial decision-making is not wholly irrelevant. I think it's a recognition, two, that there are both state courts, other than binding state appellate decisions, and state officials who are obviously involved in the judicial system that sheds light on... Mr. Kimberly, once you acknowledge that, once you open that door, and the language realistic probability seems to force that door open, once that door is open, how can you slam it shut? How can you say it really doesn't matter what the prosecutor's... Your brief talks in terms of this is going to resurrect the ordinary case analysis put to bed by Johnson. This is opening kind of a Pandora's box. But we're not opening that box. That's the Supreme Court's language. What are we to do with it if not to recognize, as you just said, that some attention has to be paid to the other state actors in this process, not just courts interpreting statutes? Your Honor, again, I think you've got to look at Duenas Alvarez and Moncrief through the lens of Taylor. Taylor tells the court how to read those cases, and it tells the court that it's an interpretive inquiry about the way the state is likely to apply its criminal laws as a matter of interpreting the state law itself. Mr. Kimberly, you are right that he says, look, when the state and federal statutes don't overlap, you don't go any further, right? So there is a step one that will cut some things off. But when they do overlap, that doesn't mean that you don't go further. So I'll give you a hypo. Let's say you have conduct that satisfies the elements of this crime that's turpitudinous, but then it runs into the buzzsaw of one of the defenses in C1 or C2. If no state prosecutor is going to prosecute it because it's clearly exempted by C1 or C2 at the second step, why is the mere fact that there's an elements match up front enough to make it categorically turpitudinous? Well, again, so, Your Honor, first, if you're representing the National Association of Criminal Defense Lawyers, we don't take a position on how to interpret crime. But imagine this is an example of a statute where even if you could stretch to say that willfully eluding or, you know, fleeing or attempting to elude an officer isn't turpitudinous, which is a big if. Does the fact that there are defenses that clearly exempt whole categories of conduct, is that not relevant to the analysis when none of the state actors prosecute people in those situations that might not be turpitudinous? It's hard to say that it's categorically irrelevant, and I'd come back to my answer to Judge Jordan. I don't – the inquiry that this analysis poses is ultimately an interpretive one. There are a range of steps. You know, obviously you look first at the text, and sometimes the text will answer the question. There's a clear overlap where there isn't or there's a lack of overlap. Sometimes decisional law from state public courts will answer the question. Beyond that, you might look to things like jury instructions. You might look to prosecutorial – prior examples of prosecutors having applied laws in particular ways as evidence that state authorities understand their law to cover certain conduct and not other conduct. So your position is we're not limited to just how the state courts might have interpreted the statute but can consider all those other data sets in determining whether there's a realistic probability the statute would be applied to the conduct being presented? That's right, Your Honor. Understanding the question of whether there's a realistic probability essentially is one about how is it reasonable to interpret this underlying state criminal statute. The expectation is manifested by the acts of the prosecutor, hypothetically. Certainly not entirely irrelevant, that's right. Who has got the burden of proof to say whether there's a realistic probability? Your colleague said it was in this context the noncitizen has to come forward and say the statute covers over broader conduct than the generic federal definition. Certainly that could not be the rule in the criminal context. Right, in the immigration context I recognize that. But what about in the immigration context? Do you have a position on who carries the burden of proof? I'm sorry, Your Honor. The National Association of Criminal Defense Lawyers doesn't take a position on who bears the burden in the immigration context. Let me ask you about the categorical approach. You quote our opinion in ROSA at page 9 of your brief to say that although the categorical approach originally emerged in the Supreme Court's decisions on the Armed Career Criminal Act, courts have extended the approach to certain aggravated felonies under the INA. That's true. But in the INA, aggravated felony is defined with a large laundry list of crimes, correct? Sure. And the categorical approach, I think you would agree, requires courts to look at the alleged state predicate offense, look at the elements of that offense, and then see if there's a match between that state offense and the generic corresponding federal offense, correct? Of course. Okay, so in this case we've got a state statute of fleeing and eluding, and we have a reference of crime involving moral turpitude. What are the elements of a crime involving moral turpitude? Yeah, obviously not defined here on the face of the statute, defined I think in the body of case law interpreting it, both this court and the Supreme Court. So I think, you know, in looking for that overlap, you've got to compare the statutory text. Yeah, but I'm asking Rick to compare, and your expert brief, and I commend you, it's terrific, and it shows great expertise. So I'm asking for your expertise. Tell this court what are the elements of a crime involving moral turpitude. Your Honor, I'm not trying to be evasive. I do apologize, though. Crime involving moral turpitude is a concept that is specific to immigration law. Right, it's a concept, not a crime. It's a description. As Judge Krause mentioned a minute ago, it's a descriptor of a series of crimes, right? Your Honor, it doesn't ultimately change, though, the nature of the inquiry that Congress has directed courts to undertake. The common element across all of these statutes calling for application of the categorical approach is a reference to the offense and to the elements of the offense. And elements of an offense don't pop in and out of existence based on prosecutorial power. Right, but I'm asking what are the elements of the offenses. I know what we need to compare on the state side. There are elements of this crime of eluding, but I don't know what I'm supposed to compare it to on the generic federal side because my referent is CIMT, and CIMT is a host of crimes, and I don't even know exactly what the listing entails. I'm not sure you could tell me what that listing entails. And I think it's why you'd find a lot of lawyers and litigants like the folks in this case who would argue that crimes involving moral turpitude is unconstitutionally vague. Ultimately, the inquiry that Congress directs this court to undertake doesn't vary. It directs the BIA to undertake this, the Attorney General to take this, but you haven't mentioned the Attorney General's views in this discussion, except courts and commentators and cases. But what about the executive? The executive with respect to interpretation of the criminal statutes or the executive with respect to interpretation of the federal statute? What constitutes a crime involving moral turpitude? Well, I think we're past the point where the BIA is owed any deference on this question. I'm sorry? Why is that? Why it's not owed any deference? I think Wilbur Bright has done away with Chevron deference. BIA used to get Chevron deference. It doesn't any longer. Chevron deference is out the window. It still gets Skidmore deference, no? If it has the power to persuade, if their opinion has the power to persuade, if they said crimes of moral turpitude have two elements, one, an overt act that's reprehensible, two, a very culpable mental state, couldn't we say, well, we don't owe you that deference under Chevron, but that's a helpful way of thinking about it, and hence it has the power to persuade under Skidmore? Doesn't – if you read Wilbur Bright, it's killing Skidmore deference as well? Look, I mean, Skidmore deference is an invitation to give persuasive arguments persuasive effect. You would owe Skidmore deference no less to any other litigant with a persuasive argument for the court. So ultimately, I think it comes down to the court's view of what is the right answer to the question. And the question, at least as I understood posed by the court's briefing order, is whether reference to elements and other language that triggers the categorical approach would allow the court to consider not just the legal meaning of the elements, but the factual question of the prosecutorial habits under the state laws that are being compared to the federal comparator. And I think the answer to that question, one, is every other court, including this court, for many, many years has rejected the BIA's approach. Hard to say that it's a persuasive approach under that circumstance. And there certainly is no basis in any of the statutory text that triggers the categorical approach that I think can be read to authorize this kind of factual inquiry into prosecutorial habits. All right. Thank you, Calvin.  We'll hear from the respondent's attorney. May it please the court. My name is Jonathan Robbins, and I'm here on behalf of Merrick Garland, the United States Attorney General, and the respondent in this matter. Good morning to everyone. As you've just been discussing, the primary question before the court today is whether the petitioner's conviction under Pennsylvania's felony fleeing and eluding statute constitutes a crime involving moral turpitude for federal purposes within the meaning of the Immigration and Nationality Act. And the short answer to that question is that it does. And that is because the elements of the state statute of conviction are a categorical match to the federal definition of a crime involving moral turpitude. That is to say that the state statute possesses both the culpable mental state and the requisite morally reprehensible act in order to render the statute a CIMT. In addition to the elements being a match, this particular statute also has affirmative defenses, which significantly undermine the notion that the statute is going to be applied in a way that is going to encompass non-turpitude misconduct. Now, the court, of course, asked the parties to address the issue of realistic probability for the purposes of this case. And as the government has explained extensively in its opening brief, this court should abrogate its rule refusing to apply the realistic probability test in the CIMT context. When the court established that rule, it did so without the benefit of the Supreme Court's decision in Moncrief. And that position is really no longer tenable based on what the Supreme Court said in Moncrief. And it's, in fact, a position that's so untenable that neither the petitioner nor any of the amicus parties have even bothered to argue that that should still remain the law. So it doesn't appear, and as I heard, I don't want to put words in my colleague's mouth, but as I heard the petitioner's counsel, it appears that he's conceded the point that there's really no reason to treat the CIMT context differently with respect to realistic probability. So that really leaves a question about whether the facial overbreath limitation on the realistic probability test applies. Petitioners are, of course, arguing that the statute is overbroad, and the government is arguing that the statute is not facially overbroad. And so there appears to be a dispute about what it means for a statute to actually be facially overbroad. But this statute presented before this court, Pennsylvania's Felony, Fleeing, and Eluding Statute, can plainly be violated even under its minimum conduct in a way that's turpitudinous. And so that really leaves the question as to how exactly does the state prosecute this offense. Does it prosecute this offense to the type of benign, non-turpitudinous conduct that would render it overbroad? Again, that's undermined by the affirmative defenses in this case, and there's certainly no actual case that the petitioners can point to that shows that somebody's going to receive a felony conviction under this statute for benign conduct. So with that said, I'm open to taking questions at this juncture. Yes? Thank you. Maybe you can clarify something for me. It seems that you have not asked this court, at least explicitly, to adopt the mandatory actual case rule of the Fifth Circuit, yet you still argue that the court needs to correct its law, our court needs to correct its law, by replacing our strict minimum reading approach with a realistic probability test. If you don't want us to adopt the Fifth Circuit's approach, then what do you actually mean when you say realistic probability test? Well, we mean exactly what the Supreme Court said in Moncrieff. Moncrieff essentially doubled down on the realistic probability test. When it first came up in the—and I want to make clear, the portion of the law that we think that the court should abrogate is the notion that the realistic probability test shouldn't apply in the CIMT context. Remember, this court in Jean-Louis essentially refused to apply the realistic probability test to the CIMT context for a host of reasons. One of the reasons was that when realistic probability was first established in Tuenes Alvarez, the petitioner in that case was raising a really sort of obscure legal theory regarding California's natural and probable consequences. To the Chief's question, why doesn't the actual case requirement solve that problem and provide an efficient and predictable standard? Well, I think it does, and the Supreme Court's exact language regarding realistic probability is that the individual must point to an actual case, either their own or another case. So, I mean, the government's position is that the court should follow exactly what the Supreme Court said about the realistic probability test. The petitioner has to point to an actual case even if the statute on its face is a categorical mismatch. For example, if this being an eluding statute penalized negligent conduct, would the petitioner have to show a negligent prosecution? No. That would be a situation where the statute is truly facially overbroad. So, again, this gets to the issue, I think a dispute in this case, about what it means to be facially overbroad. The government acknowledges that there are certain types of statutes that are going to be overbroad on their face. The Mullooly case is an example. There was a case where you had the Kansas drug schedules compared to the federal schedules. And you could see explicitly in the statute there was non-generic conduct being covered under the state because it specified the specific drugs, right? When you have that level of specificity, then you can say that the statute is overbroad. Because in that situation, you don't need to employ legal imagination to see that the statute is overbroad. It sounds like, in this regard, you are not asking us to adopt the Fifth Circuit's actual case. We are not. So, tell me how you can determine whether the statute is facially overbroad or is overbroad in some other way. Well, what we are looking for is does the statute unambiguously cover the overbroad conduct in question. So, the example from Mullooly is the drug schedules. If you can see that a specific drug is on the state's schedules as compared to the federal schedules, there's no imagination needed to see that the statute is going to punish overbroad conduct. To bring it to the CIMT context, if you have a state statute that covers negligent mens re and explicitly provides for a negligent mens re, we know that's going to cover overbroad conduct because you need a higher level of either recklessness or higher in order to constitute a CIMT. So, when you have that level of specificity in the statute, you don't need to use legal imagination. Okay. So, I want to talk about this specific statute. And it appears that the least culpable conduct here is that a driver willfully fails to bring his vehicle to a stop and crosses a state line. Is that overbroad or is it not? Well, I would say at a minimum it's ambiguous, right? Because what we're looking for is does this encompass, we're comparing it to the federal definition of a CIMT. Which is what? The board has defined this and this court has approved of the board's determination that in order to determine whether something is a CIMT, you need a culpable mental state and a morally reprehensible act. Those are the two factors that we're looking for. And what Supreme Court says that we apply the categorical approach based upon something an administrative agency tells us? Well, I would say that I don't know. It's the only area, right? When we're comparing state and federal, it's federal statutes and state statutes, full stop, right? Yes. So, why does the categorical approach even apply here? We don't know what to compare this Pennsylvania Felony Fleeing and Eluding to. Well, I mean, if you're suggesting that it's similar to the problems that were faced with the residual clause. But worse. Yeah, I am suggesting. I mean, I don't dispute that. But the Supreme Court has had multiple opportunities to address the issue of whether the CIMT provision is constitutionally vague. And it has repeatedly declined to do so. At least, I think, something like 60 or 70 years ago, that direct challenge was made to the Supreme Court. And they found that the definitions. I wasn't trying to suggest that the absence of the categorical approach, the applicability of that approach, necessarily follows that it's unconstitutionally vague. I think those are two separate questions, aren't they? They are. But I would say that it's pretty firmly established in the law now that the court employs the categorical approach in all the circuits in terms of determining whether or not a state conviction is sufficiently turpitudinous to qualify. The circuits have, but the Supreme Court hasn't. Hasn't addressed it, right? As far as I understand, no. Let me ask you a question about the burden of proof. If we apply the realistic probability test as we've been discussing, how do you get around the INA's requirement that the government bears the burden to prove that a noncitizen is removable? Well, it depends on what type of burden you're talking about. It's true that a government has the burden of demonstrating that a noncitizen is removable. But when the Supreme Court is talking about the burden that's imposed by the realistic probability test, what they're really saying is if you're going to argue that a particular statute, which the government has proven that you've been convicted of, has a reach that you're saying is broader than the generic definition, you have to prove it with authority. It's no different than making any other legal assertion. If I make a legal assertion before this court, I have to prove it by citing to the cases that support that proposition. The realistic probability is the same thing, right? If you're going to make an argument that the statute reaches overbroad conduct in a way that's not apparent on the face of the statute, the Supreme Court, all they've really said is you have to prove your work. You have to show us that that's actually the case. Back to my question about the least culpable conduct in this particular statute. And I'd like you to consider the definition of the actus reus that we used in Hilario, which is that a reprehensible act that is inherently safe, vile, or decraved, contrary to the accepted rules of morality and the duties owed to other persons. So assuming that that's the definition for now. So someone who willfully fails to bring his vehicle to a stop and crosses state lines, does it meet that definition? It does. And the reason that it does is really informed by the Supreme Court's decision in Sykes and this court's decision in Jones. To Judge Freeman's point, those seem to be inherent in the meaning of fleeing or eluding, which implies some sort of scienter of purposely evading law enforcement or trying to, for one's own purpose, to prevent stopping by the law enforcement. Whereas here, there doesn't seem to be that scienter element that's inherent in fleeing or the word eluding. Is the willfully doing the work then? Yeah, certainly the willfully. And the felony version says specifically it has to be fleeing or attempting to evade, not just failing to stop. That's true. But to tease that out, when we're looking at a categorical approach, it must be that every single way that the state statute is met also meets the federal definition. And aren't there ways that the state statute could be satisfied that wouldn't be morally turpitudinous if a person is at the edge of a state line, you know, 10 feet away, and they can't bring their vehicle to the stop in time? Or if they are at a state line and they need to get to a hospital and that's a reason for getting away from it. Don't those scenarios kind of say, gee, that might be in the elements of what could be prosecuted at the state level. But it feels very strange to say that fleeing and eluding an officer to take an urgent need to the hospital is morally turpitudinous. So in that instance, isn't there just going to be a categorical mismatch? And if there is a categorical mismatch, is there some rule for the realistic probability test to say, hey, realistically, no one's prosecuting those instances. And so we'll prune those away from what happens. So I packed a lot in there. I guess my thought is, really, are you sure that there's a categorical match here? Because I can think of a few scenarios where someone's fleeing an officer, normally that might be really, really morally turpitudinous. That's psychs. But they're doing it to take a friend in urgent need to the hospital. I don't know that we'd say that that's morally reprehensible. Well, respectfully, I don't think that hypothetical is going to actually produce a conviction under the statute, under the affirmative defenses. Look at what the affirmative defenses say. They say safety. They say safety. They do not say health. But you want us to consider the affirmative defenses and to introduce that into the whole categorical approach analysis? First, we're going to look at if there's an elemental match. And then we're going to figure out if there is an elemental match and the petitioner says it covers more conduct than the general generic. Then we're going to figure out if there's a realistic probability. Oh, yes, and we, the courts, should also be considered, and the IJs and the BIAs, all of the affirmative defenses, those in the statutes, those in the case law, those in the rules. Are you advocating that we have to introduce that into this whole process? Affirmative defenses are absolutely relevant to determining whether or not a state would prosecute a particular offense. I mean, that's part of the realistic probability test. Well, if a state has an affirmative defense of mental disease or defect, it wouldn't prosecute, it may not prosecute someone who can't form mens rea. But they don't know that until the defense is asserted. So your position would lead us not just to the affirmative defenses alleged in the statute, but we'd be duty-bound, we the courts, to look at all the affirmative defenses. And if we start going down that line, if those affirmative defenses could be met, because we have to think about the hypothetical successful litigant, then there'd be no match ever, right? Well, my point is that we've cited numerous cases which have pointed out the relevance of affirmative defenses. There's the Shamu case, and the name of the other case is escaping me right now. But we've cited two decisions by other courts of appeals, admittedly not binding on this court, but which have pointed out that the affirmative defenses narrow the scope of conduct that's implicated by the statute in those particular cases. So why are we introducing that in the analysis? After we find a categorical match, we get to reasonable probability, but then we have to do the analysis. Okay, are there affirmative defenses that would make it reasonable this crime would never be prosecuted in this way? Yeah, that would be part of the realistic probability analysis. So you're saying we should do it, and should we do it for all affirmative defenses or only those set forth in the statute of conviction? Well, it depends on the individual statute. Now, affirmative defenses are not elements of the offense. Right, and so for the categorical approach, the case law would say they're irrelevant. Right, so for example, our case law says they're irrelevant. And does the case law of every other court of appeals sort of address the issue? You're telling us to change our case law in the face of case law all over the country and kind of saying, yeah, take that in. That seems like a pretty big ask, isn't it? No, no, what we're saying, we're asking this court to conform its case law to match that of the other circuits by abrogating its rule regarding it. What other circuit in the country has said, use the affirmative defenses in your categorical approach? Not in the categorical approach, Your Honor. Well, that's what we're talking about. I'm talking about the realistic probability test. Now, I acknowledge the affirmative defenses are not elements themselves, but they're certainly relevant in the question presented. Hold on just a second, Mr. Robbins. I thought you were saying, and maybe I misunderstood you, in answer to Judge Schwartz's question, that realistic probability comes into play in the process of applying the categorical approach. Did I misunderstand you? The first thing you do is you compare the elements. That's the categorical approach. Right, yes. Okay, so what case law do you have for the idea that affirmative defenses are in that mix? Or are you asking us to take a big step here? We're not asking you to take a big step. We're asking you to take the same step that the First Circuit took and that the Fourth Circuit took in assessing whether, when we're looking at how a state actually enforces the statute in question. But you're asking us to do it by taking into account affirmative defenses, so I'm going to keep pressing you. Has any court done that? Has any court, in the context of the categorical approach, said, you take the affirmative defenses into account? Well, like I said, have they actually said, we don't take affirmative defenses into account? Like, we have said that. Our court has said that. We've cited two specific cases in our brief where the courts have looked at the affirmative defenses. Here, I'll pull it up right here. Those cases are in the context of applying the categorical approach. Yes. There's the Shamu case. Let me see here. They're cited in our supplemental brief. So you're asking us to overturn Griava-Martinez, where we said, and I'll quote, We focus on the elements of the crime when applying the categorical approach. The fact that a statute contains an affirmative defense is of no consequence. You'd like us to overturn that as well? It's not of any consequence when you're comparing the elements to elements, but it's relevant to determining the scope of the conduct that's actually prosecuted under the realistic probability. This is a two-step process. The first step is, look at the works. When we look at fleeing or attempting to elude, some people can construe that in the, Maybe it even includes going 10 yards over a state line. And other people could say, well, no, it doesn't really reach that far. It's trying to get away, not trying to get towards a hospital. If we're unclear about that, we then go to, okay, what do they actually prosecute? And what they actually prosecute is going to be influenced by, are you running up against the buzzsaw of a necessity defense or justification defense or a statutory defense? So you don't use it at the textual stage, but use it at the, We're not positive whether this is so broad that it reaches nonperpetuitous conduct. This is an edge case here, and the edge case isn't really within fleeing or attempting to elude. That's exactly right. We wouldn't apply the realistic probability test if a statute was explicit in being overrun. So the elements comparison comes first. So like I said, in the CIMT context, if the statute included negligence as the mens re explicitly, then you wouldn't have to resort to the realistic probability test or affirmative defenses or anything like that. The statute on its face. Let's take this case and leave aside the getting to the hospital. Judge Phipps has put it to you, and it is in the statute, it's under the A2 grading piece of this, that you're guilty of the offense if you are, quote, eluding or fleeing a police officer. You don't stop when the lights go on. And you cross a state line. Assume you're 100 yards from the state line. You're traveling 60 miles an hour. You can't safely stop on your side of the line. You've crossed the state line before you can safely pull over. That would seem to fit the literal elements of the crime, right? Right. Okay. At that juncture, even without taking into account the affirmative defenses, tell me what the government's view is of how you would approach that case. Because you're literally within it. I take it your argument is no one would ever prosecute that case. That's right. Okay. And that brings me to the burden of proof question put to you by Judge Montgomery Reeves. Who is it up to to make that case? Is it the government's burden to bring all that up? Does the immigrant have some kind of a responsibility in that context? Who has to deal with that, and what kind of proof do they have to deal with? Because I'd like you to address the amicus brief put in by the former immigration judges and other executive officials that say the government is asking us to take on an impossible burden, to start researching these and all these cases, like what states are actually doing what. Can you talk to that burden and to where the burden of proof would lie? Well, I would respectfully submit, Your Honor, that it's not the government trying to oppose this burden. This is the burden that the Supreme Court has explained exists. The Supreme Court has said that it is up to the petitioners or the noncitizens to provide evidence of the theory that they're trying to posit in these cases. Now, I take the point that this does create an additional burden, particularly for pro se litigants. All of that, I think, is true. It does impose an additional burden. The government isn't denying that. But as a practical matter, it's not just the petitioner who's going to be looking at this. The government, for example, when we litigate these categorical approach cases, we're I'm not trying to ask you who's the bigger victim here if we rule the way you want, the government or the litigants. I'm asking, and maybe I asked it inartfully, are you asking us to do something which is going to break the system? Because that's effectively what the former Executive Office of Immigration Review judges have said in their amicus brief. It will be devastating to the system, IJs with each of them thousands of cases in backlog, now asked to figure out with help from pro se litigants what the state of X would or would not prosecute and then trying to figure out, you know, whether we've got a match or not, whether we've got an actual crime involving moral turpitude or not. We disagree that this is going to have the effect of breaking the system. I just don't think that's very plausible. Look, the categorical approach involves all sorts of difficult types of things. Take a look at Escobar-Quintana, where we had to look at 50 analog statues at the time. I think it was back in 1974 to compare analog statues. These amici have said, you're asking us, either this is wildly flexible, you know, or the National Association of Criminal Defense lawyers say on the same page, in fact, it's completely inflexible. But they also say it invites, how do they put it, it invites a kind of flight to fancy with equivocal language, which sounds like really, really overflexible test here. Is it no test at all? That's what I'm struggling with. Does it invite us to get into stuff and say, yeah, I don't think that would ever happen, that would never happen? Or does it require people to show up with statistics and say, this is the number of cases that get prosecuted for this kind of crime in the state of X. This is the number of times it gets prosecuted for this kind of thing. If you look at the numerator and the denominator, you can see that's a very, very tiny percentage. What are we to do with it? How does it get applied? And to follow on to that, is it just prosecution? Do you have to have a conviction? I mean, what does this look like? Well, it's fair to say that the Supreme Court has not provided a lot of guidance on what exactly it looks like. I mean, I think it's fair to criticize the Supreme Court for maybe not being as clear as it could be on this. But all we have to do, all we have to look at is what the Supreme Court has said about it. And they've said that the burden is on the noncitizen to either show an actual case. Can you tease that out on what they said about that? Because we know that the government has the burden to show a categorical match. I agree, that's on the government. The government's trying to make that burden. Now, a noncitizen comes forward and says, you know the reason that that's not a categorical match is because I can envision a scenario where someone's racing to the hospital. Now, it strikes me that once they say, hey, I've got a way that this might not categorically match, doesn't it return to the government to say, no, no, no, no, no, no. That never happens. It is a categorical match after all. Why does the noncitizen have to find the mismatch and the factual proof for the mismatch? Why can't they just identify a mismatch, an overbreath, and then say, yeah, this is it. And unless the government can tell us that this never gets prosecuted, then game over. It's a categorical mismatch. It seems that you want the benefit of the mismatch and the flipping of the burden of the proof. If you want the benefit of the mismatch and the chance to do a realistic probability analysis, it seems that the petitioner's already done the work. By recognizing a scenario, maybe it's a hypothetical one where there's not a match. Once they do that, sure, put it on the government. Say, no, no, no one ever prosecutes that. It's a resource allocation point. It wouldn't break the system if the government has to do that. Why isn't that your position? Why are you trying to stick it on the pro se to invent or possibly pro se to invent the mismatch and find the evidence of the mismatch empirically? Because that's not what the Supreme Court did in Duenas-Alvarez. In Duenas-Alvarez, it was the petitioner who was positing the theory that the natural and probable consequences doctrine rendered the statute overbroad, and the Supreme Court held that burden to the petitioner. It wasn't enough to identify the mismatch. They said, if you're going to argue that the statute, the state statute in question, is overbroad in a way that's not apparent from the face of the statute, you're the one that has to present the evidence of the actual case. In Taylor, the Supreme Court came up with a hypothetical anecdote, the hypothetical Adam who was going to be at the attempted held-back robbery, and they didn't say the government has to show us a case. They just said, we can imagine a hypothetical that illustrates the point, and that was it. Game over. Well, Taylor wasn't looking at comparing how a state applied a statute. It was looking at a federal statute, so that case is distinguishable. We acknowledge that the realistic probability test doesn't apply when we're comparing a federal statute to a federal statute. Well, no, that was only one of the reasons why they said the realistic probability test didn't apply. They actually provided five reasons. They said the equities, some of the things that my colleagues have been asking about. They said also it was comparing federal to federal, but ultimately they said because there is a categorical mismatch, and they don't have to look. You don't have to show us a case when there is that. You can just have a hypothetical. So if the language is overbroad, you said that there's an extra charge.  So my question is, if there is a categorical mismatch, why can't we just rely on what's apparent from the face of the statute? Because the statute here, there isn't an apparent mismatch on the face of the statute. It's one thing if the statute is facially overbroad. Then, yes, you don't have to get into the realistic probability test, as I've explained. If the statute – Can you just acknowledge with Judge Jordan that it is on its face a facial mismatch because his example of having for safety reasons to stop a cross-state line, how is that troubleshooting it? Taylor says that realistic probability applies when there's an overlap, and there's plainly overlap here between the state statute and the federal statute. You can certainly be convicted under the minimum conduct for crossing a state line in a turpitudinous manner. The case law in Pennsylvania bears that out. Just acknowledge that a non-turpitudinous situation would on its face meet the elements. Doesn't our inquiry stop there because it is now overbroad? No, that's exactly where the realistic probability test comes into play. That's what the Supreme Court has said. If you're a legend, if the statute isn't clear and it plainly overlaps with the federal – Directly from the text of the statute. Because it's not clear whether the statute applies to non-turpitudinous conduct, or whether the state would actually apply it in a way that applies – That's the after. After is ambiguous. I asked you about a specific application of the statute. This is Commonwealth v. Stewart. It's at 2024 Westlaw 405-2982. Anyway, I recognize you're probably not familiar with this case, so I'm just going to tell you what the facts were, which is that a man was convicted of a third-degree felony, including an eluding, where he was already on the road upon which his parents lived and traveled 1.37 miles, over about 10 seconds, from the police light activation until he stopped in his parents' driveway. And that was found to be sufficient for Will Phillipe, failing to refuse to bring his vehicle to a stop. Is that inherently turpitudinous conduct? I'm not entirely familiar with the facts of that specific case. We'll take a misgiven and ask us whether that represents a vicious mind. Well, just to clarify the facts, this was an individual who was right on the line and then crossed over? No, this is not a crossing state line. I'm just talking about the failure or refusal to bring a vehicle to a stop. And the facts in this case are that he traveled 1.37 miles, over about 10 seconds, from when the police light activated until he stopped in his parents' driveway. Right, but the statute doesn't just punish a failure to stop. It punishes the extraordinary danger and the disregard of the risk to other people and property and the risk of injury or harm that goes along with that failure to stop. I think the question being asked of you, is that turpitudinous? Is just failing to stop at the direction of a police officer turpitudinous? If the fact says given, is that turpitudinous? As I understand, just failing to stop at the direction of a police officer is not itself turpitudinous. And in traveling 1.37 miles for about 10 seconds until – that was the extent of the failure to stop. It was a 10-second delay. So just to clarify, is this a misdemeanor provision or a felony provision? This was a felony provision. There was an aggravating factor of alcoholism. But I'm just talking to you about the willful failure to stop provision. The willful failure to stop is not enough to render this a CIMT, but that's not why this statute is a categorical CIMT. It's the willful failure to stop in combination with the fact that the person is showing a conscious disregard for the safety of other people. They're putting people at risk. That's why Sykes and Jones are so important. They talk about what inheres in these types of crimes, namely the risk of violence. You're creating a high risk of crashes and pursuit. It's that that's being punished that renders this a CIMT. This man stopped and drove an additional .137 miles to his parents' house and it happened to cross a state line that would be inherently vile and reprehensible. Just to clarify, are we still in a situation where the individual was driving intoxicated? The only aggravating factor would be crossing state lines in this hypothetical. Yes, because you have the culpable mens rea, the willful failure to stop, combined with the other elements. And remember, you might say that the elements just with respect to the misdemeanor provision combined with the mental state, maybe that's not enough to make this sufficiently to be a CIMT. But when you combine it with the aggravating factors and the extraordinary danger that's implicated by those aggravating factors, remember the Pennsylvania state punishes these factors at a higher rate because of the extraordinary danger they create to the public. The board has said in cases like Lopez Mesa and other cases that the building of those elements, that's what makes the conduct deviate further and further from the norms and morals and duties owed persons in society. That's what makes the statute herpetudinous. Your time's up, but Judge Krause has a question and Judge Jordan has one. Mr. Robbins, I want to step back because in answering various questions, there's sort of a fundamental question, it seems to me, maybe you could help us with. You seem to be saying that if a statute is clearly overbroad, if there's something specific that is different in the elements, then you don't apply the realistic probability test. In all other situations, you do. If it's ambiguous in any way, you do. But doesn't the case law support the inverse of that in terms of the default? Or should we be looking at the inverse of that? That is that if you have a clear match, if the elements match on exactly, then we'll apply the realistic probability test. In all other cases, we do not. That would seem to comport with the normal burdens that we place on the government versus an immigrant or defendant. And if we don't use that rule, then don't we end up with any time you have a crime involving moral turpitude, which is not an exact match, then we're in that sort of ambiguous category. We're characterizing something. So there's always going to be a realistic probability analysis. The problem with taking that approach is it doesn't square with the Supreme Court's decision in Moncrief. Look at what the Supreme Court said about how the realistic probability approach is supposed to operate. The antique firearms example, right? You have a federal statute that has this exception for antique firearms, and the states don't have this similar exception. Now, if you were making, you could make the argument, as petitioners might in this case, that, well, the state statute's overbroad, on its face, doesn't have an exception. It plainly covers conduct that's overbroad as compared to the federal generic definition. That didn't stop the Supreme Court from saying that the realistic probability test should apply. So in terms of determining what exactly renders a state actually facially overbroad, the only way you can square that is if the statute is explicit, right? Because otherwise, Moncrief doesn't make sense. Again, Moncrief, the actual case in Moncrief, the Georgia marijuana statute, right? The question was whether it had exceptions for no remuneration or small amounts, right? You could say that the statute there was facially overbroad, right? It covered more than the federal generic counterpart. But the Supreme Court still said, we're looking to these cases. The cases show that this is the way it's actually prosecuted. And in that case, the realistic probability test was satisfied because they could show that the relevant statute was prosecuted in that manner. But the reasoning of Moncrief has been cabined to some extent by the reasoning of Taylor. Well, I don't think that it has. Taylor wasn't looking at the comparison of a state to federal. I would also point out that the discussion that Taylor had in that case with respect to comparing states to federal was dicta. And it didn't say that Moncrief was overturned. And it didn't say that Moncrief is still good law. So is Duenas-Alvarez. And so when you look at it, I mean, the Supreme Court has given us not much on realistic probability, but it did give us specific examples. And this facial override argument could be applied to the examples that they gave us. And the Supreme Court still said that realistic probabilities should apply. All right, Judge Jordan's got his last question. This is just a wrap-up. I want to make sure I understand the government's position. So I'm going to kind of piggyback on what Judge Fitz asked you. Is it the government's position that the burden of proof here with respect to this issue of realistic probability lies entirely and at all points on the defendant? It's up to the defendant to demonstrate over breadth. And then it's up to the defendant to address the question of realistic probability by showing that, yes, there is a realistic probability I would get prosecuted. Is that the government's position? Yes. The realistic probability requirement is on the defendant. It's a yes on both of those things. I'm sorry. I missed the first one. It's the petitioner's responsibility to demonstrate over breadth, right? Yes. And then it's also the petitioner's responsibility to come forward and say, in some way, statistically, I guess, I would get prosecuted. Therefore, there is a realistic probability. Therefore, I should not, you know, you can't hold me responsible under these circumstances. Have I understood this right? I mean, that's – I'm only asking, I hope it's – I'm probably saying it poorly, but I'm just asking, I want to make sure I understand what the government is telling us they think is the operative principles here in this setting. I would clarify that first part. Is it the government's burden to show that the state statute is categorical match to the federal counterpart? And then that is usually challenged in the litigation by the petitioner who tries to claim that it's over broad. And the Supreme Court has said that if you're going to argue that a statute is over broad, and it's not apparent that it's over broad on space, you have to show that realistic probability. That's all I need. Isn't that the normal way statutory interpretation works? If you make an argument about the best meaning of the statute, you would move to the text, the history, and the context. And if you come up with an entirely fanciful argument about the text that's not grounded in history or context, then you would say, well, you haven't shown that that's a reasonable, ordinary meaning of the statute. That's exactly right. That's the point that I was making before, that this really isn't any different than proving any other legal point that you assert before the Courts of Appeals or before the Supreme Court. And your point for the burden point, the second point that Judge Jordan was asking you about, you're pointing to Dwayne's Alvarez case? Yes. The Supreme Court said the petitioner must show an actual case, either his own or one of the cases in the- In that case, does it matter that the burden there was on the non-citizen? Because we're talking about relief from removal. And under the INA, when you're talking about relief from removal, the burden does shift to the non-citizen. Does that matter? I don't think that it does for the notion of proving the particular legal assertion that you're making with respect to whether a statute has a reach that goes beyond what's apparent from the face of the statute. I don't dispute that the government has to prove that the individual is removable and show evidence of the conviction. That, I don't think, is in dispute. But the Supreme Court has said that the non-citizen has that requirement. And they, again, revived it in Moncrief, right? So, Moncrief, you know, the Supreme Court has doubled down even beyond Dwayne's Alvarez. Thank you, counsel. Thank you very much for your time.  Mr. Healy, the government said that the federal definition that we were to compare the state statute to was given by the Board of Immigration Appeals. Do you concede that the Board of Immigration Appeals has the power to define the elements of the offense? No, we're not conceding that. Then if the Board doesn't have the power to do that, who does and what are the elements of the offense? Well, ultimately, it's this court's responsibility to define what the elements of a crime involving moral turpitude is. And I want to make sure I understand what offense your Honor is referring to. The Board never had the authority to define the elements of the state offense. No, the CIMT, federal CIMT. I think that post-Loper, right, the BIA is not entitled to deference on that. Right. We have been relying on this court's decisions construing the meaning of the CIMT in the context. So if the Board doesn't get deference on that and our job is to apply the categorical approach comparing federal and state, what's our federal referent if we just lost the federal referent, assuming that that was at some point a valid federal referent? Well, I mean, I certainly agree on sort of a broader point that moral turpitude is an incredibly slippery term to define. In terms of how this court would go about defining that if you were writing on a clean slate. I mean, we don't define in the categorical approach. We apply and we compare federal and state. What's our federal referent that we are to compare the state crime to? Well, I think, and I apologize if I'm not understanding your question correctly, but so the INA, the question is. I'm trying to determine if there's a match. Yeah. Right? That's the whole, there's been a lot of discussion about match between federal and state. I'm trying to see if there's a match. I know what the state statute says. I know what the elements of the state offense are. I don't know what the elements of the federal offense are, and I'm asking for help with that. So I would say it is a, it's a reprehensible actus reus coupled with a culpable mens rea. Where did that come from? That definition, I think, ultimately did come from the board and. The agency that doesn't have the power to do it. Your Honor, I would be happy to challenge that definition in another case. I didn't understand that to be an issue before the court right now. But I do want to say, I mean, the government puts a lot of weight on this notion of ambiguity, but they don't actually contend that the fleeing and eluding statute is ambiguous. They don't disagree that the minimum conduct is failing to stop, minimum felony conduct is a willful failure to stop, and then crossing that state line. Where they sort of try to inject ambiguity into this is really in the generic definition of what CIMT is. That has nothing to do with realistic probability. I mean, the realistic probability inquiry, where it applies at all, is a question of how one interprets the state law, or more specifically, how do we think that the state courts. Are you suggesting that this discussion of realistic probability that we're, and it may be the case, that we're launched on a massive dicta project here because this case can be, this case can be decided simply by saying, whatever else you think, simply crossing a state line with the police officer's lights behind you, if you think about the least culpable conduct, is not something that you could characterize as showing as the mens rea requires a vicious mind. Is that your position? It is my position. I agree with that. And that was the conclusion that two panels of this court reached in Rosario Evando NK. I mean, the government sort of tries to position itself as just, you know, straightforwardly applying the Supreme Court's decision in Moncrief, but its view is radical. I mean, it would require the court to disregard its precedent on affirmative defenses in the categorical approach. It is blatantly in violation of the INA, which clearly puts the burden of proving removability on the government by clear and convincing evidence. It would upset a great deal of case law that this court has, of this court's case law, about express language and over breadth. I mean, it is a truly radical position. Who has the burden of proof on realistic probability? The Supreme Court language that was read to us at one point during this argument, the language was the non-citizen. So I don't think it's actually a burden of proof in the evidentiary sense. It's really more of a burden of persuasion about how to interpret a state law. So in that sense, it's not an evidentiary burden on anybody. Someone has to come forward with information so the decision maker knows that there's a realistic probability the statute would apply in a way that's not covered by the federal generic equivalent. So who's got to come forward with that, whether we call it persuasion or proof? I think in the situation where it would apply, it would be the defendant or the non-citizen. But I want to – so let me give you an example because this is all very abstract and it gets a little bit hard to pin down. We said in our brief the First Circuit's decision in the United States v. Burkhart. And I think much more clearly than – may I? Much more clearly than a lot of cases, it sets out how we think this should apply. The question there was whether a New Hampshire statute covered mere offers to sell drugs, which is to say offers that were not intended to be carried out or the person was not able to carry out. And the statute on its face wasn't entirely clear whether it covered that or not. But the First Circuit employed the normal tools of statutory interpretation, looked at New Hampshire cases, looked to neighboring provisions and said, we don't think that the best read of this statute is that it would cover these mere offers as opposed to bona fide offers. Now, the defendant thinks that it would cover these mere offers. We don't think that's a good reading of the statute. But if he came forward with a case where it was applied in that manner, well, we might have to rethink our interpretation of the statute. That's how this applies. And I think more clearly than many cases, Burkhart shows that the predicate for ever getting into the realistic probability inquiry at all is that you have a categorical match and then the person is claiming there's some feature of state law that would expand it beyond what the court thinks is the best reading of the statute. Can I just ask a question about jurisdiction? Because there's this thing that some courts refer to as the criminal alien bar, and it basically says in certain scenarios, courts of appeal only have jurisdiction to review legal questions and questions of constitutional dimension, constitutional issues. So if the BIA decides to do its own kind of realistic probability analysis and it makes a bunch of fact findings that this will never, ever be prosecuted, we're empirically positive that this will never, ever be prosecuted. Isn't that kind of just, you know, in resin and amber under the criminal alien bar that we can probably never revisit that because those are factual determinations at one level about realistic probability and our ability to review under the criminal alien bar is to legal questions and questions of constitutional dimension, either of which would be presented by that factual determination. Judge Phipps, candidly, I don't, I'm not, I don't have a thoughtful answer on the criminal alien bar. But I think if you're correct that it would preclude the kind of reasonable probability inquiry that the government suggests is appropriate, if it would preclude courts of appeals from reviewing them, I think that that is a grave problem and entirely inconsistent with the Supreme Court's precedent. I mean, the Supreme Court has reviewed removal decisions predicated on the categorical approach, obviously. But I guess what I'm saying is if – it strikes me that if we say something and then the BIA just says, no, we're doing our own fact finding. Who cares what the burden is, anything like this? This is the fact that we find. I mean, hasn't Congress taken that away from us to review under our jurisdiction? I think in that case that the board would be misapplying the INA because the INA requires a legal categorical approach. What is the reasonable probability analysis? Is it legal or factual? We think as it is, we think it's as properly applied, it's a legal question. As I understood Judge Phipps' hypothetical, it was being applied in a more – All right, explain how it's legal, not factual. Well, the point of it is to try and understand the meaning of the state statute, which is definitionally a question of law. Sometimes there's facts built into the legal inquiry like if you want to construe a contract, that's a question of law. But sometimes you look to common industry practice and that's a question of fact because you have to know what the industry practice is. And that may require discovery or experts or something like that. I guess what I'm saying is the ultimate question I agree with you is legal. But if the BIA says, wait, we've made a bunch of facts almost like we've made determinations to what the industry standard is and now we use that to apply legally, we might be able to revisit their application of that factual finding to the legal determination. But under the criminal alien bar, can we really pop the hood and then say, oh, let's revisit your factual findings too. I thought we kind of had to accept those. We can say you misanalyzed them later. But once they make those findings, can we touch them? I'm sorry. I don't have it. Isn't the whole enterprise of asking whether something is probabilistic, factual, not legal? Whether something's likely to occur. There's nothing legal about that. I think if you, I mean, in the abstract maybe, but what the Supreme Court has cautioned against in Duenas-Alvarez is the application of legal imagination to the statute's language. And I think that's an important sentence that cabins what followed about reasonable probability. So in order to stay away from that fanciful kind of imagination, we're going to look at facts. What actually happens? Is that sort of what they're telling us to do? No, I don't think so. I mean, in other contexts, let's say in diversity cases, you know, federal courts make predictive judgments about how a state's Supreme Court is likely to rule on an issue that it hasn't squarely confronted yet. I take your point that in some sense, like, you're considering, like, the fact of what courts have done. But that's not how we conceive of that inquiry. It's a legal inquiry about the meaning of a law. It's also consistent with the reading of the INA that puts primacy of the development of the immigration laws with the attorney general and not with the courts, right? It would seem to be powerful evidence that what Congress doesn't want is for us to be revisiting every factual scenario by amplifying legal tests as opposed to giving that responsibility to the executive branch as the INA does. Well, but the categorical approach and its legal nature has been a feature of the immigration laws for more than a century. A categorical approach, right? I think there's multiple categorical approaches, and one of the problems here is we're importing the Sixth Amendment-infused jurisprudence in the criminal context into the civil process of the immigration laws. And so it isn't really the same categorical approach. It is a similar process, right, but it comes from a different place. Well, there are slight differences between them, but, I mean, it is ultimately a question of interpretation of a statute. And more to the point, I mean, respectfully, I think the Supreme Court kind of forecloses revisiting this at a sort of basic level. I mean, this is the analysis that the Supreme Court has said Congress requires in immigration cases. Well, thank you, counsel. We are grateful for your argument, both counsel and all the attorneys involved. Thank you for your excellent briefs. Thank you for your excellent argument today. We'll take the case under advisement, and we'll take a short recess to reconsider.